2014-1262, -1273

# United States Court of Appeals
# for the Federal Circuit

---

## WARNER CHILCOTT COMPANY, LLC,

*Plaintiff-Appellee,*

v.

## LUPIN LTD. AND LUPIN PHARMACEUTICALS, INC.,

*Defendants-Appellants,*

AND

## AMNEAL PHARMACEUTICALS, LLC AND
## AMNEAL PHARMACEUTICALS OF NY, LLC,

*Defendants-Appellants.*

---

Appeal from the United States District Court for the
District of New Jersey in No. 3:11-cv-5048-JAP-TJB and
No. 3:12-cv-2928-JAP-TJB, Judge Joel A. Pisano

---

## BRIEF OF PLAINTIFF-APPELLEE

---

George F. Pappas
Jeffrey B. Elikan
Benjamin C. Block
Eric R. Sonnenschein
Jeremy D. Cobb
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 662-5000

*Counsel for Plaintiff-Appellee*
*Warner Chilcott Company, LLC*

# CERTIFICATE OF INTEREST

Counsel for the Plaintiff-Appellee certifies the following:

1.  The full name of every party or amicus represented by me is:

    Warner Chilcott Company, LLC

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The party named above in (1) is the real party in interest.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Plaintiff-Appellee Warner Chilcott Company, LLC is a wholly-owned subsidiary of WC Pharmaceuticals I Limited, which in turn is a wholly-owned subsidiary of WC Luxco S.à.r.l., which in turn is a wholly-owned subsidiary of WC Luxembourg S.à.r.l., which in turn is a wholly-owned subsidiary of Warner Chilcott Holdings Company III, Limited, which in turn is a wholly-owned subsidiary of Warner Chilcott Holdings Company II, Limited, which in turn is a wholly-owned subsidiary of Warner Chilcott Limited, which in turn is a wholly-owned subsidiary of Warner Chilcott plc, which in turn is a wholly-owned subsidiary of Actavis plc. Actavis plc is a publicly traded company listed on the New York Stock Exchange. No other publicly-held corporation owns 10% or more of the stock of Warner Chilcott Company, LLC.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

    Covington & Burling LLP: George F. Pappas, Jeffrey B. Elikan, Benjamin C. Block, Michael N. Kennedy, Eric R. Sonnenschein, Michelle L. Morin, Megan P. Keane, Jeremy D. Cobb

McCarter & English LLP: William J. O'Shaughnessy, Cynthia S. Betz, Elina Slavin, Crissa L. Rodrigue, Jonathan M.H. Short, Mark H. Anania

Fitzpatrick Cello Scinto & Harper: Dominick A. Conde, Brian V. Slater, William E. Solander, Tara A. Byrne, Will C. Autz, Jason A. Leonard, Mary Alice Hiatt

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF RELATED CASES ............................................ viii

COUNTERSTATEMENT OF THE ISSUES ....................................... 1

COUNTERSTATEMENT OF THE FACTS ......................................... 2

SUMMARY OF THE ARGUMENT ................................................. 18

STANDARD OF REVIEW ................................................................ 23

ARGUMENT ..................................................................................... 25

I.   The District Court Correctly Found That a POSA Would Not
     Have Combined 5–15 µg of EE with NA. ...................................... 25

     A.   The prior art taught that lowering EE below 20 µg
          would likely cause efficacy and cycle control problems........ 26

     B.   The prior art further taught that efficacy and cycle
          control concerns with sub-20 µg EE doses would have
          been particularly acute with NA. ........................................... 29

     C.   A POSA seeking to lower estrogen would have used a
          newer, more potent progestin, not NA. ................................. 33

     D.   The District Court did not clearly err in refusing to
          adopt Appellants' view of the facts regarding
          motivation and reasonable expectation of success. ............. 37

          1.   The '940 Patent ............................................................ 37

          2.   Prior art articles discussing 23/5 or 24/4 regimens..... 44

          3.   The Bayer Decision ...................................................... 48

      4.      Mircette ........................................................................ 49

      5.      Minesse ...................................................................... 51

      6.      Loestrin 24 ............................................................... 51

II.    A POSA Would Not Have Been Motivated to Change the Order of Administration of the '940 Patent. ................................. 53

III.   The District Court Correctly Found Objective Indicia of Non-obviousness, Which Further Support the Judgment. .................... 61

    A.    The District Court's finding of unexpected results was not clearly erroneous. ........................................................... 62

    B.    The District Court's finding of long-felt need was not clearly erroneous. .................................................................. 63

    C.    The District Court's findings regarding commercial success were not clearly erroneous. ...................................... 64

CONCLUSION ......................................................................... 68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Original Corp. v. Jenkins Food Corp.,*
774 F.2d 459 (Fed. Cir. 1985) ............................................................ 59

*Anderson v. City of Bessemer City,*
470 U.S. 564 (1985) ............................................................ 18, 24, 37

*Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.,*
713 F.3d 1369 (Fed. Cir. 2013) ........................................... 48, 49

*Bayer Intellectual Property GmBH, v. Warner Chilcott Company, LLC,*
No. 12-1032-LPS (D. Del., filed August 13, 2012) ..................... viii, 21

*Crocs, Inc. v. ITC,*
598 F.3d 1294 (Fed. Cir. 2010) ............................................................ 65

*Ecolochem, Inc. v. S. Cal. Edison Co.,*
227 F.3d 1361 (Fed. Cir. 2000) ............................................................ 65

*Galderma Labs., L.P. v. Tolmar, Inc.,*
737 F.3d 731 (Fed. Cir. 2013) ........................................... 42, 43

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.,*
655 F.3d 1291 (Fed. Cir. 2011) .................................... 24, 41, 62

*In re Applied Materials, Inc.,*
692 F.3d 1289 (Fed. Cir. 2012) ............................................................ 23

*In re Cyclobenzaprine,*
676 F.3d 1063 (Fed. Cir. 2012) ............................................................ 40

*In re Geisler,*
116 F.3d 1465 (Fed. Cir. 1997) ............................................................ 42

*In re Glatt Air Techniques, Inc.,*
630 F.3d 1026 (Fed. Cir. 2011) ............................................................ 61

*In re Huai-Hung Kao,*
  639 F.3d 1057 (Fed. Cir. 2011) ........................................... 61

*In re Trans Texas Holdings Corp.,*
  498 F.3d 1290 (Fed. Cir. 2007) ........................................... 49

*Iron Grip Barbell,*
  392 F.3d 1317 (Fed. Cir. 2004) ........................................... 42

*JVW Enters., Inc. v. Interact Accessories, Inc.,*
  424 F.3d 1324 (Fed. Cir. 2005) ........................................... 23

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,*
  688 F.3d 1342 (Fed. Cir. 2012) ........................................... 23

*Leo Pharm. Prods., Ltd. v. Rea,*
  726 F.3d 1346 (Fed. Cir. 2013) ........................................... 63

*Merck & Co. v. Teva Pharms., USA, Inc.,*
  395 F.3d 1364 (Fed. Cir. 2005) ...................................... 66, 67

*Microsoft Corp. v. i4i Ltd. P'ship,*
  131 S. Ct. 2238 (2011) ........................................................ 23

*Mintz v. Dietz & Watson, Inc.,*
  679 F.3d 1372 (Fed. Cir. 2012) ........................................... 63

*Novo Nordisk Pharms., Inc. v. Biotechnology General Corp.,*
  424 F.3d 1347 (Fed. Cir. 2005) ........................................... 36

*Ormco Corp. v. Align Tech., Inc.,*
  463 F.3d 1299 (Fed. Cir. 2006) ........................................... 33

*Pfizer, Inc. v. Apotex, Inc.,*
  480 F.3d 1348 (Fed. Cir. 2007) ........................................... 40

*Pfizer v. Teva Pharms. USA,*
  460 F. Supp. 2d 655 (D.N.J. 2006) ..................................... 62

*Polaroid Corp. v. Eastman Kodak Co.,*
  789 F.2d 1556 (Fed. Cir. 1986) ............................... 18, 24, 59

*Procter & Gamble Co. v. Teva Pharms. USA*
566 F.3d 989 (Fed. Cir. 2009) ............................................................. 23

*TriMed, Inc. v. Stryker Corp.,*
608 F.3d 1333 (Fed. Cir. 2010) ............................................................. 24

*Warner Chilcott Co., LLC v. Mylan Inc.,*
Case No. 13-cv-6560-JAP (D.N.J., filed Oct. 30, 2013) ...................... viii

*Winner Int'l Royalty Corp. v. Wang,*
202 F.3d 1340 (Fed. Cir. 2000) ............................................................. 33

*WM. Wrigley Jr. Co. v. Cadbury Adams USA LLC,*
683 F.3d 1356 (Fed. Cir. 2012) ............................................................. 40

## Statutes

35 U.S.C. § 103(a) ....................................................................................... 41

35 U.S.C. § 282 .......................................................................................... 23

## Other Authorities

Fed. Cir. R. 32 ........................................................................................... 70

Fed. Cir. R. 47.5 ........................................................................................ viii

Fed. R. Civ. P. 52 ...................................................................................... 23

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals. Plaintiff-Appellee is aware of the following cases that may directly affect or be affected by this Court's decision:

1. *Warner Chilcott Co., LLC v. Mylan Inc.,* Case No. 13-cv-6560-JAP (D.N.J., filed Oct. 30, 2013), which involves the issue of whether U.S. Patent No. 7,704,984 ("'984 patent") is valid, could "be directly affected by this Court's decision in the pending appeal." Fed. Cir. R. 47.5.

2. *Bayer Intellectual Property GmBH, v. Warner Chilcott Company, LLC,* No. 12-1032-LPS (D. Del., filed August 13, 2012), which involves an allegation that the '984 patent interferes with U.S. Patent No. 5,980,940 ("'940 patent"), could be "directly affected by this Court's decision in the pending appeal." Fed. Cir. R. 47.5.

# COUNTERSTATEMENT OF THE ISSUES

Did the District Court clearly err in finding, after carefully considering all of the evidence and assessing the credibility of the witnesses in a bench trial, that Defendants/Appellants Lupin and Amneal ("Appellants") failed to prove the obviousness of the claims of the '984 patent-in-suit by clear and convincing evidence, when:

(1) The District Court made factual findings, supported by ample record evidence, about lack of motivation to combine, lack of reasonable expectation of success in combining, and teaching away from using the claimed combination of 5–15 μg of ethinyl estradiol ("EE") with norethindrone acetate ("NA");

(2) The District Court made further factual findings, supported by ample record evidence, about lack of motivation to depart from the order of administration described in United States Patent No. 5,980,940 ("the '940 patent") and other prior art to arrive at the claimed order of administration; and

(3) The District Court made further factual findings, supported by ample record evidence, regarding unexpected results, commercial success, and long-felt need.

## COUNTERSTATEMENT OF THE FACTS

Appellants' Statement of Facts omits many factual findings of the District Court and other relevant evidence from the trial record.

**Lo Loestrin® Fe.** Lo Loestrin is an important advance in contraception: it remains the only combination oral contraceptive (*i.e.*, one with both estrogen and progestin) providing a daily dose of just 10 micrograms ("µg") EE, and is the only FDA-approved combination oral contraceptive with less than 20 µg EE. A40; A5418:25–5419:8; A5731:6–5732:2; A7404–06.

Before the introduction of Lo Loestrin, the lowest dose of estrogen employed in the combination phase of any marketed combination oral contraceptive in the United States was 20 µg EE. A5419:6–8; A5731:6–5732:2. Lo Loestrin reduced that daily estrogen dose by 50%, but unexpectedly maintained sufficient contraceptive efficacy to obtain FDA approval. A39–40; A5249:20–5261:23; A7407–15. As a result, Lo Loestrin fulfilled an unmet need for women who could not use higher EE-dose oral contraceptives because of adverse side effects related to estrogen dose, such as nausea and breast tenderness. A40–41; A5719:20–5720:5, A5734:2–5737:9.

In light of its advantages, Lo Loestrin has enjoyed commercial success, with over $250 million in net sales in the first 27 months since launch. A41–42; A5081:14–5082:10.

**Considerations in developing oral contraceptives.** Many variables need to be considered in designing a combination oral contraceptive regimen: (1) estrogen type; (2) estrogen dose; (3) progestin type; (4) progestin dose; (5) length of the hormone-free interval ("HFI"); (6) length of the regimen; and (7) order of administration of tablets. A11; A5389:6–5391:7; A7404–06.

Each of these variables can impact efficacy, safety, and tolerability; these variables are interdependent—*i.e.*, a change to one variable can impact not only the performance of the regimen as a whole, but also how the other variables perform individually. A5384:24–5388:11, A5549:6–5550:11. Some of these variables are discussed further below.

*Estrogen dose.* The evidence established that estrogen dose has critical ramifications for the performance of an oral contraceptive. An estrogen dose that is too low may lead to increased follicular development (growth of the structures in which eggs develop) and the

possibility of escape ovulation (release of a fertilizable egg), thereby threatening contraceptive efficacy. A12; 5444:16–5450:13.

An estrogen dose that is too low can also lead to poor "cycle control"—a high incidence of vaginal bleeding or spotting occurring on active pill-taking days. Such unscheduled bleeding was known to be a major reason why many women discontinued oral contraceptive use. A12; A5420:25–5425:12; A4895:14–19. An estrogen dose that is too high can also impact tolerability, for example, by causing nausea and breast tenderness. A12; A5732:3–15, A5726:12–18.

*Progestin type.* The type of progestin selected in an oral contraceptive also has major importance. As the District Court found, progestins "have different pharmacologic effects, different half-lives, and different potencies that affect the tolerability and efficacy profile of a given regimen." A12, A28–30. The oldest progestins, known as "first generation" progestins, date back to the 1960s and include NA. A5393:18–21, A5362:16–24. "Second generation" progestins include norgestimate and levonorgestrel, while "third generation" progestins include desogestrel and gestodene. A5393:22–5394:6.

Second- and third-generation progestins are more potent than first-generation progestins, resulting in "certain advantages over less potent [first generation] ones in terms of contraceptive efficacy." A28–29; A5397:21–24. Weaker progestins bind to progesterone receptors with less affinity (or strength) than do the more potent progestins. A5394:7–25. By contrast, more potent progestins are "better at suppressing ovarian activity and at making cervical mucus less sperm-penetrable, and result in less endometrial bleeding." A28; A5397:21–5399:3.

Second- and third-generation progestins also have longer half-lives than first generation progestins. A29; A5400:4–15, A5404:14–20.[1] Progestin half-life has implications for both efficacy and cycle control. A29. With respect to efficacy, "because the progestin remains in the woman's body longer … a woman can take her pill several hours late and still have an adequate concentration of drug to inhibit ovulation or keep the cervical mucus viscous." A29; A5402:10–5403:14. With respect to cycle control, progestins with longer half-lives avoid unscheduled

_____

[1] The half-life of a progestin refers to the "length of time … it takes for that progestin to reach half of its original concentration after reaching its peak concentration in the body." A29; A5399:14–16.

bleeding that can occur when "a woman [who] is taking an oral contraceptive containing a progestin that has a shorter half-life" misses a pill. A29; A5403:15–5404:24. Put simply, a progestin with a longer half-life is more "forgiving" and, correlatively, the shorter its half-life, the less time it has to do its job. A5399:17–5400:3; A5402:10–5404:24.

*Length of HFI.* As of the critical date, all but two of the marketed 28-day oral contraceptives in the world were "21/7" regimens—*i.e.*, regimens in which a combination of progestin and estrogen is provided for 21 days, followed by a 7-day HFI. A12–13; A7404–06; A5521:16–5525:2. The HFI allows for scheduled withdrawal bleeding, which helps assure the woman that she is not pregnant. A5585:3–11. The prior art discusses HFIs other than 7 days, and the use of estrogen-only tablets, but studies had not demonstrated any real-world, "clear-cut" advantage in terms of either efficacy or cycle control for such departures from the traditional 7-day HFI or 21/7 administration scheme. A5533:11–5535:2; A1063–1188(A1090); *see also* A809–942(A831).

While virtually all prior art marketed oral contraceptives used the traditional 21/7 phasing scheme, a person of ordinary skill in the art ("POSA") seeking to depart from this paradigm would have been con-

fronted with a wide variety of different administration schemes. A5600:12–5602:13. For example, a POSA could have tried 26 days of combination tablets, followed by a two-day HFI or two days of unopposed estrogen, A5601:11–19, or have departed from the 28-day regimen—for example, a 56- or 91-day regimen. A5601:23–5602:6; A13.

*Order of Administration.* The evidence also established that "[c]onsideration is also given to the order of administration of the combination tablets in relation to the other tablets such as placebo or estrogen-only tablets." A13.

Several prior art references taught potential advantages in providing hormone-free tablets after the combination tablets and before the estrogen-only tablets. A33–37; A5572:5–5575:20, A5598:9–5599:19; A435–40(A437, 4:3–9); A622–28(A628). The '940 patent, for example, disclosed a 24/2/2 regimen—twenty-four combination tablets, followed by two placebo tablets, followed in turn by two estrogen-only tablets— and stated that this order "ensures withdrawal bleeding *and* produces in the subsequent administration cycle a reduced rate for intracyclic menstrual bleeding as compared with conventional, low-dosed preparations." A33 (emphasis added); A635–40(A637, 4:28–36).

—7—

**Marketed Prior Art Oral Contraceptives.** The first oral contraceptive, introduced in 1961, contained estrogen doses five times greater than the estrogen doses used today. A25–26; A5419:12–5420:1. When scientists discovered that such estrogen doses are associated with an increased risk of deep vein thrombosis, daily estrogen doses were reduced to what became by the 1970s the traditional dose of 30–35 µg EE. A25–26; A5420:2–8, A5426:1–6.

In 1973, Parke Davis also launched the oral contraceptive Loestrin 1/20, an oral contraceptive with *20* µg EE and 1 mg NA. A26; A5418:5–22; A7404–7406. The Loestrin 1/20 regimen is depicted in the following trial demonstrative (A7883):



But Loestrin 1/20 was associated with a "high rate of unintended pregnancies as well as poor cycle control," and in the more than 30 years that followed its introduction, no oral contraceptive with less than 20 µg EE was introduced in the United States because of concerns about contraceptive efficacy and cycle control. A26–27, A30–31; A5425:13–18, A5444:4–5450:14, A5456:23–5457:8; A614–21(A615); A573–84(A578); A712–30(A713–15); A461–69(A468). In fact, Loestrin 1/20's clinical experience was so poor that, in the mid-1990s, its manufacturer developed Estrostep, which kept Loestrin 1/20's daily NA dose at 1 mg, but *increased* the daily EE dose during the last 16 of the 21 days of active hormone administration to improve efficacy and cycle control. A31; A5433:20–5434:19; A4704–06(A7406); A7886.



As of 2005, only one combination oral contraceptive in the world—Minesse, a 24/4 regimen sold in Europe—used less than 20 µg EE. A32. Minesse delivered 15 µg EE, but in combination with the *most* potent progestin, gestodene, one with a half-life substantially longer than NA's. A32; A5457:13–5458:5, A5468:8–5470:7.

The prior art (shortly before 2005) attributed Minesse's success to its use of gestodene, stating that "[u]ntil now the lowest available dose was 20 µg," but "[t]he availability of a potent progestin, such as gestodene, *makes possible* a further decrease in the estrogen dose to 15 µg without compromising the contraceptive efficacy of the preparation." A32 (quoting A804–08(A807) (emphasis added)).

**The '984 Patent.** The '984 patent claims priority to April 22, 2005. A4. Claim 6, the narrowest claim, covers administering as a method of contraception the following regimen to a woman of childbearing age:

- 5–15 µg EE in combination with mg NA for 24 days;

- followed by 2 days of EE only, where the dose of EE is the same as the dose of EE in the 24 days of combination tablets;

- followed by 2 days of placebo, or hormone-free, tablets.

A4–5; A115–19(A119,6:23–48).

Lo Loestrin is a commercial embodiment of claim 6. A6. Lo Loestrin is administered on a daily basis over a 28-day cycle in which (i) 24 active tablets comprising 1 mg NA and 10 μg EE are provided, followed by (ii) 2 active tablets comprising 10 μg EE, followed by (iii) two non-hormonal placebo tablets containing 75 mg ferrous fumarate but no active ingredients. *Id.*

Because claim 6 is the narrowest claim of the '984 patent and Appellants stipulated that they infringe it, this Brief focuses on claim 6.[2]

**The District Court's Opinion.** The District Court considered Appellants' obviousness challenge over the course of a seven-day bench trial. The two primary witnesses were Dr. Philip Darney and Dr. Kurt Barnhart.

Dr. Darney is a Professor in the Department of Obstetrics, Gynecology, and Reproductive Sciences at the University of California, San

---

[2] While this brief focuses on claim 6, this Court should affirm all of the claims of the '984 patent, given *inter alia*, the District Court's finding that it would not have been obvious to use the administration scheme described by all the claims of the '984 patent (A33–37), as well as its finding that a POSA would have used "one of the new progestins, not NA or norethindrone" (A32) if that person had sought to lower estrogen dose below 20 μg EE.

Francisco; Director of the Bixby Center for Reproductive Health; and Chief of the Department of Obstetrics, Gynecology and Reproductive Services at San Francisco General Hospital. A7. He has over 300 contraception-related publications, has taught for decades, and has been involved in at least twenty studies involving oral contraceptives. A5350:1–5353:20. Dr. Darney testified regarding the non-obviousness of the '984 patent. A7; A5361:10–17.

Dr. Barnhart is a Professor at the University of Pennsylvania who spends twenty-five percent of his time on family planning issues. A4797:15–21. The trial marked the third time in two years that he had testified on behalf of Lupin that a patent was obvious. A4890:24–4891:10.

In a detailed opinion that considered all the evidence, the District Court found that Appellants failed to prove by clear and convincing evidence that the claims of the '984 patent would have been obvious. A1–43.

The District Court's conclusion rested on multiple underlying factual findings.

The District Court found that a POSA would not have been moti-vated to make an oral contraceptive with 1 mg NA and 5–15 µg EE, as described in the '984 patent, and required by claim 6. A24. The District Court found that, at the time of the invention, prior art taught away from pairing 1 mg NA with an estrogen dose less than 20 µg EE. A25, A31. This finding rested upon constituent findings that the prior art recognized that lowering estrogen dose below 20 µg EE (1) generally raised concerns about contraceptive efficacy and cycle control, (A26–28), and (2) specifically raised concerns about trying to do so with NA, (A30–31).

The District Court found that Loestrin 1/20, which combined 1 mg NA with *20* µg EE, had "poor" cycle control and a relatively high rate of pregnancy, and that the clinical experience with Loestrin 1/20 was so poor that its manufacturer subsequently *increased* the estrogen dose above 20 µg EE to make the prior art oral contraceptive Estrostep. A30–31.

Based on this prior art, which highlighted the problems with com-bining 1 mg NA with *20* µg EE, and which taught that "*more* than 20 µg EE should be used with 1 mg NA," the District Court found that a

POSA would not have been motivated to combine 1 mg NA with 5–15 μg EE. A31.

The District Court further found that, if a POSA had sought to lower estrogen dose below 20 μg, that person would have been led to use not NA, but a more potent progestin with a longer half-life. A31–33. The District Court relied in part upon the experience with Minesse, whose use of such a low EE dose as 15 μg was "ma[de] possible" by the use of gestodene. A32.

The District Court carefully considered the Appellants' principal prior art reference, the '940 patent, and what that patent taught in light of the prior art as a whole. A21–25. The District Court found that the '940 patent did not mention NA, let alone recommend using it in combination with 5–15 μg EE, and that the '940 patent instead emphasized and preferred the newer, more potent progestins gestodene and levonorgestrel. A24.

The District Court also found that there was no data in the '940 patent that would have allayed the general concerns about lowering estrogen dose to 5–15 μg EE, let alone in combination with 1 mg NA. A24–25, A32. To the contrary, as Appellants' expert Dr. Barnhart

agreed, a POSA would have known that not all of the potential regimens that *were* encompassed within the scope of the '940 patent would have been contraceptively effective. A25.

The District Court separately found that a POSA would not have been led to the administration scheme claimed by the '984 patent (Combination[3]→EE→Placebo) from the '940 patent. A33–37. Rather, the '940 patent specifically attributed benefits to *its* particular order of administration (Combination→Placebo→EE). A33.

The District Court found that the order of administration in the '940 patent involved administering estrogen-only tablets immediately before combination tablets, because the estrogen-only tablets at the end of a cycle would be immediately followed by combination tablets in the subsequent cycle.[4] A33–34.

The District Court found that the prior art taught that placing estrogen-only tablets immediately before the combination tablets was

---

[3] Combination refers to the combination of progestin and estrogen.

[4] For example, consecutive cycles of the '940 patent regimen would provide the following sequence of tablets: Combination→Placebo→**EE**→**Combination**→Placebo→EE. As indicated in bold, the end of the first cycle places the EE-only tablets immediately prior to the combination tablets of the second cycle, thereby providing a "priming" effect for the combination treatment in the second cycle.

beneficial, because it allowed estrogen to "prime" progesterone receptors, resulting in a better bleeding pattern. A34. In contrast, the District Court found that the prior art did not teach that one could get these benefits if one were to reverse the order of placebo and estrogen-only tablets described in the '940 patent. A34–35.

The District Court also rejected Appellants' contention that a POSA would have been motivated to reverse the '940 patent's order to increase the incidence of amenorrhea, *i.e.*, the absence of scheduled withdrawal bleeding during administration of placebo pills. A35–36. The District Court found that amenorrhea was generally an *unwanted* condition that caused women to experience anxiety and confusion over whether they are pregnant, a condition that traditional oral contraceptives had been designed to *avoid*. A35. The District Court further found that the '940 patent itself recognized that a lower incidence of amenorrhea *improved* user compliance, and that a POSA would therefore not have wanted to *increase* the frequency of amenorrhea. A36.[5]

---

[5] The District Court also found that evidence about Loestrin 24 did not assist Appellants, partly because that regimen was not even prior art. A37–38. And the District Court did not agree that U.S. Patent No. 5,552,394 ("the '394 patent") would have led a POSA to use 1 mg NA with 5–15 μg EE, because, *inter alia,* a POSA would have understood

In examining the prior art as a whole and weighing the parties' competing contentions, the District Court carefully considered the documentary evidence and evaluated the testimony and credibility of the testifying experts. The District Court found Dr. Darney to be more credible than Dr. Barnhart, giving "weight to the opinions of Dr. Darney over Dr. Barnhart." A22.

The District Court found that Dr. Barnhart's opinions were "driven in large part by hindsight," and that his specific approach to obviousness "contradict[ed] the very principles" that he testified a POSA would follow. A22–23.

The District Court also found that objective indicia further supported a conclusion of non-obviousness. A39–42. The District Court found that Lo Loestrin's Pearl Index and FDA approval demonstrated unexpected contraceptive efficacy, and that Lo Loestrin has "enjoyed commercial success and fills an unmet need." A39–42.

---

that not all regimens encompassed by that patent would have been contraceptively effective. A38–39.

## SUMMARY OF THE ARGUMENT

The District Court's judgment that Appellants failed to meet their burden of demonstrating invalidity by clear and convincing evidence rests on two primary and independent findings of fact:

(1)    the POSA would not have been motivated to combine, or reasonably expected success in combining, an estrogen dose below 20 µg EE with NA; and

(2)    the POSA would not have been motivated to reverse the order of administration of the '940 patent, so that estrogen-only tablets would precede placebo tablets.

Unless the Court determines that *both* of these factual findings— each of which was supported by extensive evidence and numerous constituent factual findings—are clearly erroneous, it must affirm.

Appellants' "burden of overcoming the district court's factual findings is, as it should be, a heavy one." *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1558–59 (Fed. Cir. 1986) (citations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even [if] convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 565 (1985). Given the ample evidence supporting each of the District Court's findings, Appellants cannot meet their burden.

**Combining less than 20 µg EE with NA.** A vast array of evidence demonstrated that the POSA would not have been led to use less than 20 µg EE with 1 mg NA. At the time of the invention, the POSA would have known that NA was a weak progestin with a short half-life, unsuitable for use with sub-20 µg EE doses. As the District Court found, the *only* sub-20 µg oral contraceptive at the time of the invention used the most potent progestin, gestodene, which the prior art reported "makes possible a further reduction in the estrogen dose … without compromising the contraceptive efficacy of the preparation." A32.

Additionally, the POSA would have known that the combination of 20 µg EE and 1 mg NA—Loestrin 1/20—was associated with "a high incidence of unintended pregnancies" and "poor" cycle control. A30. Given this known poor track record of Loestrin 1/20, the POSA would not have selected the same progestin and progestin dose, and then compounded the likelihood of poor performance by dramatically reducing the accompanying estrogen dose. Indeed, Loestrin 1/20's manufacturer recognized its shortcomings and attempted to correct them—first with Estrostep and then with Loestrin 24—by *adding* estrogen.

The District Court, relying upon all of this evidence, other prior art to the same effect, and the testimony of Dr. Darney, concluded that the POSA would not have been led to an oral contraceptive containing less than 20 µg EE with 1 mg NA. Appellants contend that the District Court should have made *different* factual findings by ignoring or discounting all of the above evidence and instead crediting Dr. Barnhart's version of the facts. Appellants thus ask this Court to retry *de novo* the case below on a paper record, divorced from the applicable standard of review, which is directly contrary to Rule 52 and precedent.

Unable to demonstrate error, let alone clear error, in the District Court's factual findings, Appellants resort to straw men. They accuse the District Court of being "snared by diversions" in considering the import of Loestrin 1/20 and Estrostep, and posit that because the District Court did not find that the '940 patent taught what Appellants say it taught, the District Court must have decided *sub silentio* that a prior art patent has to lead to a commercial product for it to be relevant. Br. 4. Neither attack is correct. The District Court, consistent with this Court's precedent, carefully considered *all* of the evidence—including the credibility of the witnesses—in evaluating the prior art *as a whole*.

Appellants also contend that the *Bayer* decision compels reversal. That assertion lacks basis in law—different patents and proceedings have no collateral estoppel effect. It also lacks basis in fact—the patent-in-suit in *Bayer* claimed a combination of 20 μg of EE with a different progestin, not the combination of 5–15 μg EE with NA in the specific order of administration claimed in the '984 patent.

**Reversing the Order of Administration.** An array of evidence also supported the District's Court's independent finding that the POSA would not have reversed the '940 patent's order of administration.

The prior art, including the '940 patent, U.S. Patent No. 4,921,843 ("the '843 patent"), and the Mircette regimen, taught that if estrogen-only tablets are administered, they should be administered immediately before the combination tablets to prime progesterone receptors in the endometrium.

The '940 patent expressly attributed benefits to this order of administration, stating that it "ensures withdrawal bleeding and produces in the subsequent administration cycle a reduced rate of intracyclic menstrual bleeding compared with conventional, low-dosed preparations." A33. Based on this evidence and the testimony of Dr. Darney,

the District Court found that the POSA would not have been led to reverse the order of administration that the prior taught was beneficial.

Appellants contend that District Court should have made a *different* finding—that a POSA would have been motivated to reverse the order of the tablets to increase the incidence of amenorrhea. But the District Court found, based upon explicit teachings in the prior art, that amenorrhea was "generally an unwanted side effect" that "raises the concern that the contraceptive is not working." A35.

**Objective indicia of non-obviousness.** The District Court also did not clearly err in finding objective indicia of non-obviousness. This included evidence of unexpectedly good efficacy, as reflected in Lo Loestrin's Pearl Index and eventual FDA approval, neither of which would reasonably have been expected at the time of the invention. The District Court also did not clearly err in considering the commercial success enjoyed by Lo Loestrin in such a crowded and competitive marketplace, or in crediting the testimony of Dr. Kagan that it met a long-felt need by delivering a daily dose of 10 µg EE while maintaining efficacy.

# STANDARD OF REVIEW

Appellants' description of the standard of review is incomplete in multiple respects.

1.    The '984 patent is presumed valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242–43 (2011); 35 U.S.C. § 282.

2.    While the legal conclusion of non-obviousness is reviewed *de novo*, the underlying factual determinations are reviewed for clear error. *Procter & Gamble Co. v. Teva Pharms. USA*, Inc., 566 F.3d 989, 993 (Fed. Cir. 2009); *see* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

3.    Motivation, reasonable expectation of success, what a reference teaches, whether a reference teaches away, and whether there is objective evidence of non-obviousness such as unexpected results, commercial success, or long-felt need are all questions of fact. *See In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (what a reference teaches, whether a reference teaches away, and whether there is commercial success); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,

688 F.3d 1342, 1366–67 (Fed. Cir. 2012) (motivation); *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1308 (Fed. Cir. 2011) (unexpected results); *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1341 (Fed. Cir. 2010) (reasonable expectation of success).

4.    "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [this Court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 565; *see also Polaroid*, 789 F.2d at 1558–59 ("It is commonplace that findings other than those of the trial judge might find some support in the record, or that reviewing judges if sitting at trial *might* have reached such other findings. It is therefore ineffective on appeal merely to present a scenario in which the trial judge could have gone appellant's way." (citation omitted)).

5.    When the findings of the trial court are based on determinations about the credibility of witnesses, they "can virtually never be clear error." *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334 (Fed. Cir. 2005).

# ARGUMENT

The District Court correctly found that the Lo Loestrin invention was not obvious. That finding rests on two primary, independent findings of fact:

(1) the POSA would not have been motivated to combine, or reasonably expected success in combining, an estrogen dose below 20 μg EE with NA; and

(2) the POSA would not have been motivated to reverse the order of administration taught in the '940 patent, so that estrogen-only tablets would precede placebo tablets.

As demonstrated below in Parts I and II, respectively, each of these findings is supported by a robust evidentiary record, is not clearly erroneous, and independently warrants affirmance of the judgment. As demonstrated in Part III, there was also ample evidence to support the District Court's findings of objective indicia of nonobviousness, which only further support the conclusion of nonobviousness.

## I.    The District Court Correctly Found That a POSA Would Not Have Combined 5–15 μg of EE with NA.

Claim 6 of the '984 patent covers an oral contraceptive that provides a daily dose of 1 mg NA and 5–15 μg EE. A119(6:23–48). The District Court found that, at the time of the invention, a POSA "would

not have been motivated to make" an oral contraceptive with 1 mg NA and 5–15 µg EE, and that the prior art taught away from doing so. A24, A31. As demonstrated below, those factual findings are well-supported by the evidentiary record, and are not clearly erroneous.

### A. The prior art taught that lowering EE below 20 µg would likely cause efficacy and cycle control problems.

The District Court based its finding that a POSA would not have been motivated to make an oral contraceptive with 5–15 µg EE and 1 mg NA partly on the finding that reducing estrogen dose below 20 µg EE would have raised general concerns about cycle control and efficacy. A26–28.

Although an oral contraceptive containing a daily dose of *20* µg EE had been introduced in the United States in 1973, no combination oral contraceptive containing *less* than 20 µg EE was introduced in the United States in the more than thirty years that followed. A5418:5–5419:5; A7404–06; A26. The District Court found that two general concerns explained this absence. A26. *First*, "there was widespread recognition that lowering estrogen below 20 µg could reduce contraceptive efficacy." A26; A5444:4–5450:14, A5456:23–5457:8. *Second*, "there

was widespread recognition that as estrogen doses declined, cycle control problems increased." A27; A5420:9–5426:18; A615; A578; A713–15; A468. Each of these findings was well-supported by the evidence.

As the District Court noted, the 2005 prior art edition of *A Clinical Guide to Contraception* explained—at a time when marketed oral contraceptives in the United States used 20–35 μg EE—that "[w]e are probably at or very near *the lowest dose levels* that can be achieved *without sacrificing efficacy*." A27; A1089 (emphasis added); A5449:3–22. Given such a statement, and consistent with Dr. Darney's trial testimony, it was reasonable for the District Court to find that, as of April 2005, a POSA would have been concerned that further lowering estrogen would compromise contraceptive efficacy. A26, A28; A5444:4–5450:14, A5456:23–5457:8.

Moreover, ample evidence supported the District Court's finding that "a POSA would have expected that lowering estrogen even further to less than 20 μg would have increased follicle size even further and put women at greater risk of unintended pregnancy." A26–27. Undisputed evidence showed that, as estrogen doses declined, oral contraceptives were less effective at stopping follicular growth, and that

women using oral contraceptives with 20 μg EE had larger ovarian folli-

cles than women using oral contraceptive with higher EE doses—

suggesting that women would be more likely to ovulate and become

pregnant as estrogen doses declined. A26; A5444:4–5449:2; A670–

76(A675); A501–08(A502); A636(2:61–67); A831–32.

The District Court's finding that the "expected loss of … cycle con-

trol" further "weighed against lowering estrogen dose below 20 μg" also

had ample support in the record. A28. Both sides' experts agreed that "a

POSA in 2005 would have understood that estrogen is critical to main-

taining cycle control," and that "as the estrogen dose decreased, cycle

control became worse," resulting in increased incidence of breakthrough

bleeding. A27; A5420:9–5425:12; A4895:14–4897:19; A714; A578; A468.

And documentary evidence and testimony demonstrated that poor cycle

control is a "major continuation problem" that "gives rise to fears and

concerns," is "aggravating, and even embarrassing," (A886), and affects

not only whether women continue taking the oral contraceptive, but al-

so their quality of life. A5435:9–5436:23; *see also* A5725:17–5726:7. As

Dr. Darney testified, it was largely these concerns that prevented

pharmaceutical companies in the United States from introducing sub-20

µg EE combination oral contraceptives in the thirty years leading up to the '984 invention. A5451:9–5453:18, A5456:23–5457:8.

In light of this evidence, the District Court found that concerns about expected loss of cycle control and efficacy would have deterred a POSA from using less than 20 µg EE. A26–28. That prior art studies had not shown that lowering EE below 30–35 µg would result in greater safety further supports this finding. A27–28; A5452:17–5453:6, A5559:16–5560:19; A4893:13–4894:3, A4984:17–4985:1.

## B. The prior art further taught that efficacy and cycle control concerns with sub-20 µg EE doses would have been particularly acute with NA.

The District Court further found that "[e]ven if a POSA would have sought to lower estrogen dose to below 20 µg EE in a new oral contraceptive," that person would "not have sought to lower … EE below 20 µg EE with NA" as the selected progestin. A28, A31. Far from being clearly erroneous, that factual finding was clearly correct.

The prior art recognized that NA was a weak progestin with a short half-life that had disadvantages in terms of efficacy and cycle control—properties that made it a poor choice for use in a low-dose oral contraceptive. A30. The prior art cited by the District Court taught:

> [w]eaker progestins such as … norethindrone acetate were also formulated with low dose estrogen in combination pills. These latter formulations, in several dose levels, however, were associated with breakthrough bleeding and unpredictable uterine bleeding in 40 to 50% of the cases. Because of this fact, their acceptance has been minimal.

A30 (citing A7294–323(A7302, 3:17–37)); A5459:6–5460:25.

The District Court also found that the poor performance of Loestrin 1/20 would have further dissuaded a POSA from making an oral contraceptive with 1 mg NA and *less than* 20 µg *EE*. A30–31.

The District Court found that Loestrin 1/20 had "a high rate of unintended pregnancies as well as poor cycle control," and thereby highlighted the problem with using 1 mg NA with *20 µg EE*. A30–31. Overwhelming evidence supported that factual finding, including:

- ***Lammers***, which reported that Loestrin 1/20 "was shown in several studies to suppress the pituitary-ovarian axis insufficiently, with a relatively high incidence of unintended pregnancies and a high rate of irregular bleeding." A450–60(A457–58); A5438:22–5440:21;

- ***The WHO reference***, which reported that Loestrin 1/20 "was shown to be significantly less acceptable and effective" than the 30 µg EE oral contraceptive to which it was compared, and that Loestrin 1/20 was "considered ... unsatisfactory because of ... higher discontinuation rates." A401–11(A408); A5437:18–5438:20;

- ***Bounds***, which reported that Loestrin 1/20 exhibited "poor" cycle control, with discontinuation rates due to unscheduled bleeding several times higher than a 30 µg EE oral contraceptive. A395–400(A399); A5426:19–5427:16;

- ***Guillebaud***, which reported that, because unscheduled breakthrough bleeding with Loestrin 1/20 "is almost universal, this pill has never been very popular." A598–613(A604); A5431:19–5433:17;

- ***Serfaty***, which cited Loestrin 1/20 as an example of a regimen with "inadequate contraceptive efficacy and/or poor cycle control." A441–49(A442); A5462:13–5464:24.

The evidence further established that Loestrin 1/20's poor performance dissuaded manufacturers in the United States from introducing any other oral contraceptive containing 20 µg EE for the twenty years following Loestrin 1/20's introduction. A31; A5452:22–5453:18; *see also* A26; A5418:25–5419:8; A7404–06; A7885. And testimony and exhibits demonstrated that "[e]ven the manufacturer of Loestrin 1/20 recognized that [Loestrin 1/20's] performance was problematic," and that such recognition led that manufacturer to modify Loestrin 1/20 by *increasing* estrogen dose "to address … efficacy and cycle control problems," resulting in the product known as Estrostep. A31; A5433:20–5434:19; A7406.

In light of such evidence, the District Court found that the experience with Loestrin 1/20 and Estrostep taught that "*more* than 20 µg EE

should be used with 1 mg NA, *not* that an acceptable oral contraceptive could be designed with even less estrogen than was used in Loestrin 1/20." A31 (emphases added). There was nothing clearly erroneous about that factual finding—the combination of 1 mg NA and 20 µg EE in Loestrin 1/20 was shown by overwhelming evidence to have "poor" cycle control and questionable efficacy, and reducing estrogen dose *further* from the level used in Loestrin 1/20 would only have been expected to make those problems worse.[6] See *supra* Part I.A.

The District Court also found that Estrostep *taught away* from the claimed invention by teaching that estrogen should be increased—not decreased—in an oral contraceptive containing 1 mg NA and 20 µg EE. A31. That factual finding was also abundantly reasonable, and itself

---

[6] In contending that a POSA would have reasonably expected contraceptive efficacy with 1 mg NA and 5–15 µg EE, Appellants cite Dr. Barnhart's testimony that one prior art article reported that the norethindrone dose "needed to be a contraceptive was a relatively modest dose of 0.5 to one milligram." Br. 30, 48 (citing A472; A4866:14–4867:22). But that figure was for norethindrone—not NA—which has different androgenic and progestogenic properties. A4956:2–23. And there is no reason why a POSA would have relied on that article (even if it had discussed NA) to conclude that 1 mg NA would be effective with 5–15 µg EE when actual clinical trials conducted on women showed that, even when combined with *20 µg* EE, 1 mg NA "suppress[ed] the pituitary-ovarian axis insufficiently, with a relatively high incidence of unintended pregnancies." A457–58; A5438:22–5440:21; A30.

warrants affirmance, because it would not have been obvious to make an oral contraceptive with 5–15 µg EE and 1 mg NA when the prior art taught away from doing so. *See, e.g.*, *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349–50 (Fed. Cir. 2000) (evidence of teaching away can alone defeat a contention of obviousness); *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1308 (Fed. Cir. 2006) ("[A] reference that 'teaches away' from a given combination may negate a motivation to modify the prior art to meet the claimed limitation.").

## C.   A POSA seeking to lower estrogen would have used a newer, more potent progestin, not NA.

The District Court also found that "if a POSA had tried to make a combination oral contraceptive with less than 20 µg EE in 2005, the prior art taught use of a newer, more potent progestin with a long half-life rather than a less potent, first-generation progestin such as NA." A31–32. That factual finding, too, was amply supported by the record and not clearly erroneous.

The evidence established that second- and third-generation progestins were known to be more potent than NA, resulting in advantages "in terms of contraceptive efficacy," such as greater follicular suppression and thickening of cervical mucus. A28–29; A5397:21–5398:25. The

evidence further established that "second and third-generation progestins have longer half-lives than first-generation progestins," such as NA, and that longer half-life was also recognized to have advantages in terms of efficacy and cycle control. A29. In light of these advantages, it was not clearly erroneous—and, in fact, was clearly correct—for the District Court to find that, if a POSA had sought to lower EE below 20 μg EE, such a person would have sought to do so with a more potent second- or third-generation progestin, not NA. A31–32.

The District Court supported this finding with citations to the prior art, including the '315 patent (A7294–7323), which, after explaining that acceptance of NA had been "minimal" when coupled with what it referred to as "low" doses of estrogen, taught that one needed to use a more potent progestin to reduce estrogen:

> [T]he more potent the progestin administered, less estrogen in combination with the progestin is required to achieve effective contraception and menstrual cycle control. However, when a less potent progestin is administered in combination with a reduced dosage of estrogen to adapt to adverse metabolic effects, menstrual cycle disruption results.

A7302(3:31–37); A5459:17–5461:21; A32.

In support of its finding, the District Court also cited a prior art reference by Serfaty, which explained that while "efforts to lower estro-

gen dose below 30 µg EE *with NA had failed* … the appearance of newer progestins such as desogestrel may open development possibilities." A32 (citing A442) (emphasis added); A5464:1–21. This observation was echoed in other prior art, which recognized that one motivation for developing newer second- and third-generation progestins, such as desogestrel and gestodene, was to improve cycle control, (A5465:11–5467:15; A523–28(A523)), and that the newer progestins yielded better cycle control than could be achieved with NA. *See, e.g.*, A604 (switching from NA to third-generation progestin desogestrel would be expected to improve cycle control); A458(Tbl.5) (showing significantly lower breakthrough bleeding rates with desogestrel-based regimen Mercilon than NA-based Loestrin 1/20).

Finally, the District Court explained that the prior art Minesse regimen confirmed its finding that, if a POSA had sought to use an oral contraceptive with less than 20 µg EE, that person would have done so with a newer, more potent, second- or third-generation progestin. A31–33. Indeed, the prior art expressly "attributed the efficacy of Minesse to its use of gestodene": "Until now the lowest available dose was 20 µg," but "[t]he availability of a *potent progestin*, such as gestodene, *makes*

*possible* a further decrease in the estrogen dose to 15 µg without compromising the contraceptive efficacy of the preparation." A32 (quoting A807) (emphasis added); *see also* A5468:10–5470:7.

Appellants' sole response is to argue that the District Court's "focus on progestin potency and half-life [wa]s misplaced." Br. 47. But, as discussed above, numerous prior art publications specifically taught the use of newer, more potent progestins when using low estrogen. And, on half-life, the District Court reasonably credited Dr. Darney's testimony that progestins with longer half-lives have important advantages in terms of contraceptive efficacy and cycle control, including that a longer half-life makes the pill more "forgiving," *i.e.*, not as important for women to take the pill exactly on time every day, and that short half-life was one of the reasons that NA has been associated with poor cycle control. A5402:10–5404:24; A24, A28–30. Appellants therefore cannot establish clear error. *See Novo Nordisk Pharms., Inc. v. Biotechnology General Corp.*, 424 F.3d 1347, 1353–56 (Fed. Cir. 2005) (no clear error when district court's finding was plausible).

### D. The District Court did not clearly err in refusing to adopt Appellants' view of the facts regarding motivation and reasonable expectation of success.

Seeking to evade the import of the factual findings discussed above, which fatally undermine their theory that a POSA would have been motivated to combine, and reasonably expected success with combining, 1 mg NA with 5–15 µg EE, Appellants resort to a variety of arguments that the District Court should have made *different* findings. As discussed below, however, all of these contentions lack merit and fall far short of establishing clear error. *See, e.g.*, *Anderson*, 470 U.S. at 565 (appellate court may not reverse under clear error standard if the district court's account of the evidence is plausible).

#### 1. The '940 Patent

Virtually ignoring the prior art the District Court found taught away from combining 1 mg NA and 15 µg EE, Appellants argue that, "based on the teachings of the '940 patent alone," a POSA would have had a reasonable expectation of success in making an OC with 15 µg EE and 1 mg NA. Br. 46–47. But the District Court found otherwise (A24), and that factual finding was not clearly erroneous.

As the District Court correctly found, the '940 patent does not even *mention* NA, let alone provide data or examples that would have assuaged concerns based on other prior art that a combination of 5–15 µg EE and NA would have poor cycle control and efficacy. A24–25; A635–40; A5565:24–5566:2. And Dr. Darney testified that the '940 patent "doesn't say that [15 µg EE] could be used with any progestin, particularly not norethindrone acetate of one milligram." A5628:14–5629:2; A5566:3–6. Given such evidence, and in light of other art that taught away from lowering EE below 20 µg EE *with* NA, see *supra* Part.I.B, it was not erroneous, let alone clearly erroneous, for the District Court to find that "[w]hile the '940 patent provides an EE range of 15–25 µg EE, it does not suggest anywhere that 15 µg EE … could be used successfully with NA."[7] A24.

Appellants respond, citing testimony from Dr. Barnhart (whom the District Court discredited), that the '940 patent "teaches a progestin

---

[7] Appellants also contend that, like the '940 patent, United States Patent No. 5,756,490 ("the '490 patent") taught that a 24/4 regimen discloses a preferred estrogen dose of 15–25 µg EE. Br. 44–45. But the '490 patent "is closely related to the '940 patent," A37, with a specification that the experts agreed was virtually identical to the '940 patent. A4951:7–22, A4964:2–5; A5564:5–5565:2. Like the '940 patent (A24), the '490 patent emphasizes gestodene and levonorgestrel, and nowhere mentions NA, let alone recommends using NA with 15 µg EE. A592–97.

that is interchangeable with NA," and also teaches the use of 15 µg EE. Br. 28, 46. But Appellants' contention is flawed for multiple reasons.

*First*, Dr. Barnhart acknowledged that norethindrone and NA "are chemically distinct," and that he himself did not treat these progestins as "interchangeable" in his own prior art publication, listing them as separate and distinct progestins with different progestational and different androgenic activity. A4955:16–4956:23. References to norethindrone in the '940 patent therefore cannot be considered references to NA, and the District Court did not clearly err in declining to treat these progestins as the same. A24.

*Second*, as the District Court also found, a POSA would have recognized that not all of the numerous contraceptive regimens that *were* encompassed within the scope of the '940 patent would be contraceptively effective. A25; A4949:10–13. Thus, even if NA *did* fall within the teachings of the '940 patent, that fact alone would not have told a POSA that a regimen with 1 mg NA and 15 µg EE would necessarily be contraceptively effective, particularly in view of other prior art teaching away from using 1 mg NA and 15 µg EE. *See supra* Part I.B.

Appellants also argue that the District Court should have found that claim 6 of the '984 patent was *prima facie* obvious, because the highest EE dose of claim 6 overlaps with the lowest EE dose specified in the '940 patent (15 µg). Br. 25–26. But that contention is also incorrect.

As an initial matter, Appellants are wrong to suggest that a "presumption of obviousness" would attach if claim 6 were considered *prima facie* obvious. Br. 25–26. This Court has explained that *prima facie* obviousness serves no purpose in the litigation, as opposed to patent prosecution, context. *See In re Cyclobenzaprine*, 676 F.3d 1063, 1075–81 & n.7 (Fed. Cir. 2012). *Prima facie* obviousness, to the extent that it is relevant at all, does not alter the presumption of validity that the '984 patent enjoys. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359–60 (Fed. Cir. 2007) (presumption of patent validity includes "a presumption of non-obviousness" that requires the patent challenger to "prov[e] the factual elements of invalidity by clear and convincing evidence. That burden of proof never shifts to the patentee to prove validity."); *WM. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1365 n.5 (Fed. Cir. 2012) (finding of *prima facie* obviousness "does not shift the burden from the patent challenger").

Moreover, *prima facie* obviousness could not apply to the facts in this case for at least three reasons. *First*, claim 6 is a claim to a *regimen*—not an EE dose—and that regimen contains multiple components that are *not* encompassed or described by the '940 patent, including its administration scheme and its use of 1 mg NA.[8] A119(6:23–48). As there is no overlap between the *regimens* described by the '940 patent and those encompassed by claim 6 of the '984 patent, the former could not render the latter *prima facie* obvious. Subject matter is considered as a whole for purposes of an obvious analysis, 35 U.S.C. § 103(a), and it therefore is inappropriate for Appellants to assert (Br. 25–27) that the claims of the '984 patent are presumed obvious based solely on the disclosure of a range of 15–25 µg EE in the '940 patent.

*Second*, there is no *per se* rule of *prima facie* obviousness even when the claimed invention *does* overlap with a prior art range. For example, in *Genetics Institute, LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1306–07 (Fed. Cir. 2011), this Court held that there

---

[8] The District Court found that five changes would need to be made to the '940 patent to arrive at claim 6 of the '984 patent. A23. While Appellants complain about those findings, their own expert agreed with them, A4963:13–4968:18, and there are multiple differences between claim 6 of the '984 patent and the disclosure of the '940 patent.

was no *prima facie* obviousness based on an overlap with a prior art range when there was no evidence of motivation to select the claimed invention and the prior art disclosed 68,000 embodiments. Here, the District Court found that the '940 patent encompasses *millions* of potential oral contraceptive regimens (A22), and that there was no motivation to make an oral contraceptive with 15 μg EE and 1 mg NA. A24. Thus, under *Genetics Institute*, *prima facie* obviousness could not exist even if there were an overlap between the regimens claimed by claim 6 and those described in the '940 patent. *Cf. Iron Grip Barbell*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) (finding *prima facie* obviousness when the prior art disclosed only four possibilities for holes in weight-lifting plates).

*Third*, the District Court made findings—supported by a large body of evidence—that the prior art *taught away* from the claimed invention. A25, A31. As Appellants themselves recognize (Br. 26), there can be no *prima facie* obviousness if the "art in any material respect taught away" from the claimed regimen. *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997). Of similar effect is *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, (Fed. Cir. 2013), in which this Court specifically

—42—

noted that the patentee had presented *no* credible evidence of teaching away. *Id*. at 738–39. Here, by contrast, the record shows that the prior art taught that *decreasing* EE to the 20 µg used in Loestrin 1/20 led to worse efficacy and cycle control, and that, far from being "optimal," Loestrin 1/20's dosage was considered unsatisfactory by skilled artisans and as a barrier to reducing the EE dose further. *See supra* Part I.A.[9]

*Finally*, Appellants criticize the District Court's finding that "a POSA would have had no reason to ignore the '940 patent's emphasis on gestodene and levonorgestrel, and instead select NA," A24, accusing the District Court of treating the '940 patent's preference for gestodene and levonorgestrel as evidence that '940 patent itself taught away from NA. Br. 29–30. But Appellants mischaracterize the District Court's reasoning.

The District Court found that Loestrin 1/20, Estrostep and other prior art taught away from using less than 20 µg EE with 1 mg NA.

---

[9] Unlike this case, the obviousness dispute in *Galderma* involved a change in a *single* variable of the composition; the "sole dispute between the parties [was] whether it was obvious to use a 0.3% adapalene composition for the treatment of acne." 737 F.3d at 736. Like *Iron Grip*, *Galderma* has no application to evaluating the obviousness of a claimed regimen involving multiple interdependent variables (A11–13) with millions of possible combinations. A22.

A28–31. In observing that the '940 patent emphasizes gestodene and
levonogestrel, and does not even *mention* NA, the District Court was
simply observing that nothing in the '940 patent would have provided
an affirmative reason to select NA, as opposed to progestins such as
gestodene and levonorgestrel, particularly when the prior art taught
that: (1) newer, more potent progestins offered advantages in terms of
efficacy and cycle control; and (2) NA had been unsuccessful when cou-
pled with the higher EE dose of 20 µg. A24–33.

### 2. *Prior art articles discussing 23/5 or 24/4 regimens*

Although Dr. Barnhart barely mentioned such articles in his tes-
timony, Appellants now contend that seven prior art articles discussing
"24/4" or "23/5" regimens also warrant reversal, because those refer-
ences purportedly "[taught] that efficacy or cycle control issues caused
by utilizing low estrogen doses could be ameliorated by employing a
24/4 regimen, rather than the traditional 21/7 regimen." Br. 43. The
implication of Appellants' argument is that the District Court clearly
erred by not finding that a POSA would have reasonably expected suc-
cess in making an oral contraceptive with 1 mg NA and 5–15 µg EE
using the claimed administration scheme of the '984 patent, which uses

24 days of combination tablets, because (according to Appellants) the prior art taught that cycle control and efficacy problems with a 21/7 scheme would vanish if one were to increase the number of combination tablets from 21 to 24 days. But the District Court did not err, much less clearly err, in declining to accept Appellants' view of the facts, and the cited articles do not assist Appellants.

*None* of the articles described an oral contraceptive containing NA with less than 20 µg EE, let alone suggested that the efficacy and cycle control problems that a POSA would anticipate with such a combination would disappear if the period of combination tablet administration were extended from 21 to 24 days. In fact, most of these articles did not even describe oral contraceptive regimens containing less than 20 µg EE at all.[10] And *none* showed that shortening the 7-day HFI, or using a 24/4 regimen, significantly improved breakthrough bleeding or contraceptive failure rates compared to a 21/7 regimen.

---

[10] The Oosterbaan article (A664–69) describes Minesse. As discussed below, and as the District Court found, Minesse taught that if a POSA were going to lower estrogen below 20 µg EE, that person should do so with gestodene, a newer progestin. A32. As the District Court found, Minesse did not create a reasonable expectation of success in lowering EE below 20 µg EE with NA. A28–33.

This was consistent with other evidence at trial, which established that a POSA in 2005 would have understood that regimens with 24 days of combination tablets, or with additional estrogen-only tablets, had not been shown to provide "clear-cut" advantages in terms of cycle control and contraceptive failure rates compared to 21/7 regimens:

- ***A Clinical Guide to Contraception***, which reported that reducing the 7-day HFI to four days [for a 24/4 regimen], or adding unopposed estrogen, yielded contraceptive "failure rates and breakthrough bleeding rates that *are comparable to the standard [21/7] regimens* and *no clear-cut advantages for these alterations can be established*." A1090 (emphasis added); A5533:11–5535:2; *see also* A831.

- **Studies failing to show improvement in cycle control and contraceptive failure rates with 24/4 regimens or shortened HFI.** Prior art studies did *not* show that shortening the traditional 7–day HFI, or using a 24/4 regimen, would lead to significant improvement in contraceptive failure rates or unscheduled bleeding rates; some actually showed *inferior* performance. *See, e.g.*, A629–34(A632) (unscheduled bleeding *higher* on the 24/4 regimen than the otherwise identical 21/7 regimen); A677–686(A681) (24/4 regimen containing 15 µg EE significantly worse cycle control than a 21/7 regimen containing 20 µg EE); A731–39(A735) (virtually identical intracylic bleeding for 21- and 23-day regimens); A733 (identical contraceptive failure rates (Pearl Indices) for 21- and 23-day regimens); A1090 ("comparable" failure rates for 24/4 and 21/7 regimens). *See also* A5527:13–5532:9, A5533:11–5535:2.

- **Scarcity of 24/4 marketed regimens**. The oral contraceptive market also reflected the view that there were no "clear-cut advantages" to shortening the traditional 7-day HFI, or adding unopposed estrogen. While the concept of shortening the 7-day HFI had been known for decades by 2005, only *two* marketed oral contraceptives—Minesse and Mircette—employed an HFI of less than seven days. A5521:16–5525:2; A7314–15 (Example 9). The marketplace thus reflected the view that a shortened HFI was not seen as a "great leap forward," or one that would allow one to successfully lower EE below 20 μg with NA. A5524:11–5526:2, A5533:11–5535:2.

Given the absence of "clear-cut advantages" for 24/4 regimens, and the knowledge that contraceptive failure and breakthrough bleeding rates of 21/7 regimens were "comparable" to (or, in some cases, better than) those using unopposed estrogen and HFIs shorter than 7 days, there is no basis to suggest that a POSA would have "known," or reasonably expected, that shortening the HFI of, or adding unopposed estrogen to, Loestrin 1/20 would have made Loestrin 1/20's efficacy and cycle control problems vanish, or allowed for a successful *further* estrogen reduction down to 5–15 μg EE with 1 mg NA.[11] A5525:3–5527:8.

---

[11] For the same reason, there is no merit in Appellants' contention that the District Court clearly erred in finding that Loestrin 1/20 and Estrostep taught away from the claimed invention simply because these were 21/7 regimens, rather than regimens with 24 days of combination tablets. Br. 49.

Dr. Barnhart's testimony further confirms this conclusion. He acknowledged that an ineffective 21/7 oral contraceptive would not necessarily become effective by shortening the HFI, and that if the dose in the combination tablets is not contraceptively effective, "you've got a bad pill" that cannot be remedied by adding estrogen-only tablets. A4900:23–4901:18. Dr. Barnhart further admitted that, even today, years after the application for the '984 patent, it *still* has not been demonstrated that shortening the HFI would improve cycle control. A4973:14–20. Likewise, Dr. Darney testified that the "principal efficacy of low-dose pills" occurs in the first 21 days of administration, meaning that if the estrogen dose given during those 21 days is insufficient, extending the period of combined administration to 24 days, and thereby shortening the HFI, will not remedy the problem. A5483:11–5484:7.

### 3. The Bayer Decision

Appellants also cite *Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1371–72 (Fed. Cir. 2013), but their reliance on that decision is misplaced.

*Bayer* involved different claims, and therefore different issues. The claims in *Bayer* involved an oral contraceptive using *20* µg EE in

combination with the progestin drosperinone, not 5–15 µg EE with NA. *See* 713 F.3d at 1372. Thus, there was no issue in *Bayer* whether a POSA would have been motivated to make, or reasonably expected success in making, an oral contraceptive with 5–15 µg EE and 1 mg NA, let alone one requiring the administration scheme of the '984 patent.[12]

The *record* in this case also differs from *Bayer*. There was no factual finding in *Bayer* that the prior art taught away from using the combination of hormones covered by the claims-in-suit, nor was there evidence establishing that a regimen with a shortened HFI would not have been seen as providing "clear-cut" advantages over 21/7 regimens. A5524:11–5526:2, A5533:11–5535:2; A1090.

### 4.    *Mircette*

There is also no merit in Appellants' contention that Mircette renders clearly erroneous the District Court's finding that a POSA would not have reasonably expected success in combining 1 mg NA with 5–15 µg EE. Br. 44 (citing A646–A655).

---

[12] Even if the issues in this case were the same as in *Bayer* (and they are not), issue preclusion could not apply because Warner Chilcott was not a party in *Bayer*. *See In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1296−97 (Fed. Cir. 2007) (issue preclusion cannot be applied against a non-party to an earlier action).

Mircette was a modification of the desogestrel-based 21/7 oral contraceptive called Mercilon. A5486:6–16; A7406. But Mircette—an attempt to remedy cycle control problems with Mercilon—did not lower estrogen dose in the combination phase *below* 20 μg EE, much less do so with NA. A5486:6–5487:16; A4979:4–4980:18. Instead, Mircette kept the estrogen dose in the combination tablets at 20 μg EE and, without changing the progestin type or dose of Mercilon (150 μg desogestrel), added five days of unopposed estrogen to the last five days of what had been a 7-day HFI. A5486:6–5487:16. Mircette thus did not use unopposed estrogen to lower EE below 20 μg EE in the combination phase, as Appellants erroneously imply, and a POSA would not have understood from Mircette that shortening the HFI could be used to compensate for a "drastic" reduction in estrogen dose below 20 μg EE with the more potent progestin *desogestrel*, let alone with the weaker progestin NA. A5525:3–5526:2; A4979:4–4980:18.[13]

---

[13] Appellants also cite U.S. Patent Re. 35,724 ("the '724 patent"), which covered Mircette, without explaining how it shows that the District Court clearly erred in finding that a POSA would not have been motivated to make an oral contraceptive with NA and 5–15 μg EE. Br. 44. In any event, the '490 patent advanced by Appellants taught that if one reduced estrogen below 20 μg EE in the '724 patent, one would compromise contraceptive efficacy. A5552:22–5554:6.

5. *Minesse*

Appellants also point to the Minesse regimen in arguing that the District Court clearly erred in finding that a POSA would not reasonably have expected success in combining NA and 5–15 μg EE. Br. 46. But the Fruzzetti reference cited by the District Court (A32), taught that it was the *use of gestodene*, not the 24/4 phasing, that "ma[de] possible" Minesse's reduction in EE dose below 20 μg. A807; *see also* A5468:10–5470:11. The District Court credited this reference, and there was no clear error in doing so. A32.

6. *Loestrin 24*

Finally, Appellants argue that the Loestrin 24 regimen would have provided a POSA with a reasonable expectation of success in making an oral contraceptive with 1 mg NA and 15 μg EE, and that the District Court clearly erred by not so finding. Br. 49. But the District Court found that Appellants did not meet their burden in proving that Loestrin 24, which was in the process of being developed at the time of the '984 patent, was even prior art (A38), and Appellants have not shown that that finding was clearly erroneous.

Even if Appellants had met their burden, moreover, knowledge that the Loestrin 24 regimen was being tested in women to determine

whether it would be safe and effective would only have further taught away from the claimed invention. Loestrin 24 was yet another modification of the Loestrin 1/20 regimen, in which the number of days of combined hormone administration was increased from 21 to 24 days without otherwise altering the daily hormone doses.[14] A5541:6–17.

By increasing the number of days of combined hormone administration, Loestrin 24—like Estrostep—*added* EE to the total per cycle amount of estrogen in Loestrin 1/20. *Id*. Thus, if a POSA had known that Loestrin 24 was being tested in women, as Appellants argue (Br. 50), that would constitute another example of *teaching away*. A31.

---

[14] The District Court also found that there was "no evidence that, based on the '394 patent," which covers the Loestrin 24 regimen, "a POSA would have been motivated to make the claimed invention." A39. That finding was also not clearly erroneous. Both sides' experts agreed that "not all regimens encompassed by [the] ranges of the '394 patent would have been contraceptively effective," (A39; A4947:19–4949:13, A5608:21–5609:3), and undisputed expert testimony established that the limited data in the '394 patent (based on monkeys) was deeply flawed and did not provide meaningful information about how an oral contraceptive would function in women. A5605:10–5609:11. Recognizing the flaws of the '394 patent, Appellants advanced the '940 patent, not the '394 patent, in asserting obviousness. A4804:14–21.

## II.   A POSA Would Not Have Been Motivated to Change the Order of Administration of the '940 Patent.

The '984 patent claims a specific 24/2/2 administration scheme: tablets containing a combination of EE and NA are administered for 24 days, followed by two days of EE-only tablets, followed by two days of placebo tablets. A33. The District Court did not err—much less clearly err—in finding that neither "the '940 patent [nor any other prior art] would … have led the skilled artisan" to use this order of administration. A33–35.

Appellants contend that the District Court should have found that a POSA would have looked to the administration scheme of the '940 patent (Combination→Placebo→EE) and then reversed the order of placebo and estrogen-only pills in that patent, to arrive at the sequence of tablets in the '984 patent (Combination→EE→Placebo). Br. 33. But the District Court disagreed, and that factual finding was far from clearly erroneous. A33.

As the District Court found, the '940 patent expressly ascribed benefits to *its* order of administration, stating that its sequence "ensures withdrawal bleeding and produces in the subsequent administration cycle a reduced rate for intracyclic menstrual bleeding

as compared with conventional, low-dosed preparations." A33; A636(4:28–36). There is no reason why a POSA would have wanted to give up those benefits, and thus no reason to have departed from the '940 patent's order. A33–34; A5568:4–5569:15, A5572:5–5577:2.

Furthermore, as the District Court found, additional prior art taught that the order of tablets in the '940 patent would provide bene-fits in terms of cycle control and efficacy. A34–37; A5572:5–5575:21, A5598:9–5599:20. Because a regimen is repeated as long as a woman remains on the contraceptive (A9), the '940 patent's order of admin-istration results in estrogen-only tablets being given immediately before the next combination phase (e.g., Combination→Placebo→**EE**→**Combination**→Placebo→EE). A33–34. The prior art taught that this order of administration would allow the estrogen to "prime" proges-terone receptors, leading to less intermenstrual bleeding. A34; A5572:5–5575:21, A5598:9–5599:20. For example, the prior art '843 patent cited by the District Court (A34) taught that

> estrogen[] stimulate[s] progesterone receptor sites. By stimu-lation of progesterone receptors early in the menstrual cycle, estrogen administration allows a reduction in the incidence of intermenstrual bleeding. That is, breakthrough bleeding and spotting are minimized ... .

A437(4:3–8); A5598:9–5599:20, A5572:5–5573:19.

In addition, Mircette, the embodiment of the '843 patent and only commercial product using estrogen-only tablets, put estrogen tablets after placebos and immediately before the next cycle's combination phase. A34, A5573:11–5575:21. The District Court found that, by 2005, "there had been seven years of clinical experience with Mircette, and the prior art reported that its placement of estrogen-only tablets immediately before the combination tablets was successful." A34; A5574:3–5575:21; A628. By contrast, as Dr. Darney testified, and the District Court found, "nowhere did the prior art teach that one could achieve the same effect on progesterone receptors if one reversed the order of the estrogen-only and placebo tablets." A34–35; A5575:15–5576:24, A5599:11–25. The District Court's finding that "a POSA would have understood that if one were going to use estrogen-only tablets in an oral contraceptive, it was important to administer them immediately before the combination tablets," and that there accordingly would not have been motivation to reverse the order of placebo and estrogen-only tablets in the '940 patent (A33–37), thus easily passes muster under the deferential "clear error" standard of review.

Appellants also argue that the prior art did not teach that estrogen-only tablets needed to be provided immediately prior to combination tablets to obtain the benefits of progesterone receptor priming. Br. 38–41. But that factual contention is unsupported, and the District Court correctly rejected it. A34, A37. In both the '490 and '843 patents, estrogen-only tablets *were* provided immediately prior to the combination tablets, and there is no statement in either patent that one could obtain the benefits of progesterone receptor priming if one did not place estrogen immediately prior to the combination tablets. *See generally* A592–97; A435–40; A5554:21–5555:7, A5598:9–5599:25. Moreover, Appellants cite no expert testimony supporting their point of view (Br. 39–41), and Dr. Darney's testimony contradicts the factual proposition that they now seek to support with nothing but lawyer argument. A5572:5–5577:2, A5598:11–5599:25.

Appellants also argue that a POSA would have been motivated to reverse the order of placebo and estrogen-only tablets in the '940 patent to increase the incidence of amenorrhea (Br. 34), but the District Court found "the credible evidence to be otherwise," (A35) and that finding was not clearly erroneous.

Amenorrhea is the absence of withdrawal bleeding during the administration of placebo tablets. A4842:4–8; A5632:12–15. As Dr. Darney testified, amenorrhea was "considered an unwanted side effect by women in general,"[15] and a condition that makers of oral contraceptives generally sought to avoid. A36; A5584:22–24, A5585:14–5586:25 ("[Y]ou certainly wouldn't want to build amenorrhea into a pill."). Dr. Darney further explained that not having a menstrual period is a sign of pregnancy, so amenorrhea raises the concern that the contraceptive is not working. A5584:22–5585:11.

The prior art *Clinical Guide to Contraception* summarized the problem:

> The major problem with amenorrhea while on oral contraception *is the anxiety produced in both patient and clinician because the lack of bleeding may be a sign of pregnancy.* The patient is anxious because of the uncertainty regarding pregnancy, and the clinician is anxious because of the medicolegal concerns stemming from the old studies, which indicated an increased congenital abnormalities among the offspring of women who inadvertently used oral contraception in early pregnancy ... .

---

[15] Dr. Darney testified that there was a "small proportion of women" who did not mind amenorrhea, but that "in general," as of 2005, amenorrhea was an unwanted side effect. A5586:11–25, A5636:17–20; A5584:22–24.

> *Amenorrhea is a difficult management problem.* A pregnancy test allows reliable assessment for pregnancy even at this early stage. However routine, repeated use of such testing is expensive and annoying and *may lead to discontinuation of oral contraception ... .*

A1149 (emphases added).

Dr. Darney further testified that the '940 patent itself recognized that lower incidence of amenorrhea results in better compliance, because women who experience amenorrhea on oral contraceptives, mistakenly thinking that they may be pregnant, sometimes discontinue oral contraceptives—which itself can result in unintended pregnancy. A5585:14–5586:10; A638(6:33–39). As Dr. Darney explained, a POSA would have wanted to avoid such results, and therefore would not have wanted to *increase* the incidence of amenorrhea by reversing the administration of the placebo and EE tablets. A5585:14–5586:25.

Relying on the prior art and the testimony of Dr. Darney, the District Court agreed that a POSA would not have been motivated to increase amenorrhea, and therefore rejected the sole motivation argument advanced by Appellants for modifying the '940 patent to arrive at the administration scheme of the '984 patent. A35–36. The District Court found "that amenorrhea was an ... unwanted side effect," and

that, in light of the evidence as a whole, there was "little support for the argument that a POSA would have been motivated to reverse the order of the tablets in the '940 patent in order to increase the incidence of amenorrhea." A35.

Appellants' only response is to cite evidence that they argue could have led to a different factual finding. Br. 35–37. But "it is commonplace that findings other than those of the trial judge might find some support in the record, or that reviewing judges if sitting at trial might have reached such other findings. It is therefore ineffective on appeal merely to present a scenario in which the trial judge could have gone appellant's way." *Polaroid*, 789 F.2d at 1558–59. Instead, on appeal, the question is whether the *District Court*'s findings were clearly erroneous. And those findings, supported by prior art and testimony from a leading expert (whom the Court found credible), were not erroneous, let alone clearly erroneous. *See Am. Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459 (Fed. Cir. 1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). That Appellants were required to prove their motivation theory by *clear and convincing evidence* only further confirms that conclusion.

Appellants' motivation argument suffers from another fatal flaw. Reversing the '940 patent's order of tablets would raise other concerns about efficacy and irregular bleeding by depriving the regimen of the benefits of progesterone receptor priming. The '940 patent states:

> [t]he subsequent administration of 2 or 1 hormone-free daily units or inclusion of 2 or 1 blank pill days as well as the subsequent phase, in which dosage units that contain only one estrogenic compound as a hormonal active ingredient are administered daily over 4, 3, or 2 days, ensures withdrawal bleeding and produces in the subsequent cycle *a reduced rate of intracyclic menstrual bleeding* compared with conventional, low-dosed preparations.

A637(4:29–36) (emphasis added). The '940 patent thus taught that its order of tablets produced "in the subsequent cycle a reduced rate" of unscheduled bleeding. A33–34; *see also* A5572:5–5573:9; A5629:22–5631:10; A5638:6–13; A5644:25–5645:10. Hence, even if the POSA had wanted to increase the incidence of amenorrhea, such a person would not have reversed the order of placebo and estrogen-only tablets, which would result in increased unscheduled bleeding. A5638:6–13. No expert opined that some women desire more unscheduled intracyclic bleeding; rather, both stressed the importance of good cycle control and a low incidence of unscheduled bleeding. A27–28; A4895:20–4897:19; A4898:25–4900:12; A5435:9–5436:23.

## III. The District Court Correctly Found Objective Indicia of Non-obviousness, Which Further Support the Judgment.

In light of each of the independent findings above, this Court can affirm without considering the District Court's additional findings of unexpected results, satisfaction of an unmet need, and commercial success. A39–42. That said, those findings, which only further confirm the correctness of the judgment, were also not clearly erroneous.

Repeating the gambit of trying to sweep away factual findings as legal error, Appellants argue that all of this evidence was "irrelevant," because claim 6 describes a range of 5–15 µg EE, and the Lo Loestrin product only represents one dose (the middle dose) within this range. Br. 52–53. Appellants are wrong: The law requires only that objective indicia be "reasonably commensurate with the scope of the claims." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). The law does not require an applicant to "test every embodiment within the scope of his or her claims," *id.*, nor "[to] 'sell every conceivable embodiment of the claims in order to rely upon'" objective indicia of non-obviousness. *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011) ("Commercial success evidence should be considered so long as what was sold was within the scope of the claims.'") (citations omitted).

**A.   The District Court's finding of unexpected results was not clearly erroneous.**

This Court reviews a finding of unexpected results for clear error. *Genetics Inst.*, 655 F.3d at 1308. The District Court found that the contraceptive efficacy and FDA approval of Lo Loestrin was unexpected. A39–40. That finding was not clearly erroneous.

Ample evidence supported the finding that it was unexpected that "the Pearl Index (a numerical representation of the efficacy of a combined oral contraceptive) of Lo Loestrin is not statistically significantly different than that of Loestrin 24."[16] A39–40. Lo Loestrin uses half as much EE in the daily combination pills as Loestrin 24. A40; A5249:20–5261:23. Dr. Thisted testified that, with half the EE as Loestrin 24, a POSA would have expected to see a substantial increase in pregnancy rates, and thus a statistically significant difference in Pearl Index, but that unexpectedly there was no such statistical difference. A5261:9–5261:23; A5268:14–5269:2; A7407–15; A7834–52.

---

[16] Loestrin 24 is a commercial embodiment of the '394 patent, and there are no commercial embodiments of the '940 or '490 patents against which to compare efficacy. *See, e.g., Pfizer v. Teva Pharms. USA*, 460 F. Supp. 2d 655, 658–59 (D.N.J. 2006) (finding evidence of unexpected results as compared to a non-prior art product when the alleged closest piece of prior art did not have an embodiment that could be tested).

Furthermore, Dr. Darney testified that a POSA in April 2005 would not have expected that Lo Loestrin, with NA and only 10 µg EE, would have been sufficiently effective to obtain FDA approval.[17] A5615:8–14, A5616:15–5617:18. But Lo Loestrin unexpectedly was approved by the FDA, there were no (and still are no) other sub-20 µg EE regimens with FDA approval (A40), and FDA approval is "relevant in evaluating the objective indicia of non-obviousness." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013). Accordingly, the District Court's finding of unexpected results rested on ample evidence.

## B. The District Court's finding of long-felt need was not clearly erroneous.

Ample evidence also supported the District Court's finding that Lo Loestrin fulfilled a long, unmet need. A40. The District Court received and credited the testimony of Dr. Kagan, "a practicing clinician who frequently prescribes oral contraceptives," who explained that, before

---

[17] In arguing that Lo Loestrin's approval was expected, Appellants incorrectly focus on the time of submission of the Lo Loestrin NDA (Br. 53–54), rather than the April 2005 priority date of the claimed invention. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012) (evaluating unexpected results and stating that "the proper analysis ... analyzes the prior art and understanding of the problem at the date of invention").

Lo Loestrin, many estrogen-sensitive women "could not use combination oral contraceptives because of side effects related to the EE dose, such as nausea, breast tenderness, and headaches." A40–41; A5719:20–5720:5, A5734:2–5737:9.

Dr. Kagan testified that, with its ultra-low daily dose of 10 μg EE, Lo Loestrin satisfied a need for many of these women, as it is "especially well-suited for those women who could not use a combination birth control pill prior to" Lo Loestrin because of the higher estrogen doses in earlier combination oral contraceptives. A40–41; A5736:14–5737:9. In addition, Dr. Barnhart conceded that progestin-only oral contraceptives are less effective and have more breakthrough bleeding than combination oral contraceptives (A4902:16–4904:7), further establishing that Lo Loestrin satisfied an unmet need.

### C. The District Court's findings regarding commercial success were not clearly erroneous.

The District Court's finding that Lo Loestrin was a commercial success was also not clearly erroneous. A40–42. Appellants do not dispute that Lo Loestrin achieved commercial success, with over $250 million in net sales and 3 million prescriptions in the first 27 months

since launch. A41; A5076:10–5077:20, A5081:14–5082:10; A7442–50(A7447–50); A7523–35(A7523–25); A7536.

Appellants instead contend that Lo Loestrin's commercial success lacks a nexus to the claimed invention. Br. 57. But the District Court concluded otherwise (A42); that finding was not clearly erroneous. *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1377–78 (Fed. Cir. 2000) (nexus determination reviewed for clear error).

To begin, nexus is presumed because Lo Loestrin embodies the claimed invention. *See, e.g.*, *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310–11 (Fed. Cir. 2010). Appellants' attempt to shift the burden is improper.

Regardless, substantial evidence supported the District Court's finding of nexus. For example, the marketing expenditures for Lo Loestrin were "less on a per-prescription and per-dollar sales basis than … [other] oral contraceptives [launched] in the same timeframe," yet its "market share significantly exceeded that of four other oral contraceptives regimens launched around the same time. A41–42 (finding that Lo Loestrin's sales were not due to the pricing of the product, but the patented features of the regimen); A5088:23–5091:6, A5096:23–5097:23; A7451–54; A5086:7–5088:8; A7991.

Appellants also contend that Lo Loestrin's commercial success was the result of "cannibalization of Loestrin 24," (Br. 59) and that Lo Loestrin prescriptions came from prescriptions that otherwise would have gone to Loestrin 24. Br. 60; A5140:23–5141:16. But the District Court was correct to reject that argument for at least the following reasons:

- Physicians would not have prescribed Lo Loestrin over Loestrin 24 unless they thought Lo Loestrin offered benefits over Loestrin 24. *See* A5092:12–5093:11; A5722:6–5728:10; A5162:7–11.

- New-to-brand prescriptions of Loestrin 24 were flattening or decreasing for six or more months before the launch of Lo Loestrin. A6354–87(A6358).

- Data indicated that increases in Loestrin 24 prescriptions did *not* result from increased marketing expenditures, and that Loestrin 24 prescriptions increased during periods of low marketing expenditures. A5163:21–5165:13.

- The decrease in Loestrin 24 prescriptions also corresponds to the number of prescriptions for other newly-introduced products Sayfral, Beyaz, Generess, and Natazia. A5163:1–18.

Citing *Merck & Co. v. Teva Pharms., USA, Inc.*, 395 F.3d 1364, 1376–77 (Fed. Cir. 2005), Appellants also argue that the District Court "inappropriately gave weight" to Lo Loestrin's commercial success because the '394 and '940 patents allegedly blocked others from making Lo Loestrin. Br. 61–63. Appellants base this argument on the testimony

of their expert Dr. David, but that testimony lacked any scientific sup-
port or other evidence that anyone was actually deterred from
developing a sub-20 µg EE combination oral contraceptive because of
such patents. A5019:25–5020:14, A5024:17–5025:2.

Moreover, the active ingredients of Lo Loestrin were not subject to
patent protection or FDA new chemical entity exclusivity, as was the
case in *Merck. Compare* A5021:25–5022:20 *with Merck*, 395 F.3d at
1377; *see also Janssen Pharms.*, 2012 WL 3990221, at *23–24 (rejecting
argument that "blocking patent" precluded others from arriving at the
claimed invention because "the active ingredients in the [regimen] were
not under patent protection" as of the priority date).

In any event, there is no indication that the District Court gave
dispositive weight to commercial success, and even *Merck* does not hold
that commercial success evidence becomes *irrelevant* when a "blocking
patent" is alleged. *Cf. Merck*, 395 F.3d at 1377. And the evidence of Lo
Loestrin's number of prescriptions and outperforming other contempo-
raneously-launched oral contraceptives is further evidence of industry
praise and recognition, and relevant for those reasons as well.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

/s/ George F. Pappas

George F. Pappas
Jeffrey B. Elikan
Benjamin C. Block
Eric R. Sonnenschein
Jeremy D. Cobb
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 662-5594
Fax: (202) 778-5594
Email: gpappas@cov.com

*Attorneys for Plaintiff-Appellee*
*Warner Chilcott Company, LLC*

# PROOF OF SERVICE

I HEREBY CERTIFY that on this 5th day of May 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record on the following service list by electronic delivery:

Robert F. Green
Caryn C. Borg-Breen
Jessica M. Tyrus
Marc R. Wezowski
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 N. Stetson Avenue
Chicago, IL 60601-6731
rgreen@leydig.com
cborg-breen@leydig.com
jtyrus@leydig.com
mwezowski@leydig.com

Jamaica P. Szeliga
LEYDIG, VOIT & MAYER, LTD.
700 13th Street, N.W., Suite 300
Washington, DC 20005-3960
jszeliga@leydig.com

*Counsel for Defendants-Appellants
Lupin Ltd. and Lupin Pharmaceuticals Inc.*

Paul H. Kochanski
LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, New Jersey 07090
Telephone: (908) 518-6314
pkochanski@ldlkm.com

*Counsel for Appellants Amneal
Pharmaceuticals
of New York, LLC and Amneal
Pharmaceuticals, LLC*

s/ George F. Pappas
_____
George F. Pappas
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, DC 20004
Telephone: (202) 662-5594
Fax: (202) 778-5594
Email: gpappas@cov.com

*Attorney for Plaintiff-Appellee
Warner Chilcott Company, LLC*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief of Plaintiff-Appellee complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and contains 13,654 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been composed in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Century Schoolbook font.

/s/ George F. Pappas
George F. Pappas
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, DC 20004
Telephone: (202) 662-5594
Fax: (202) 778-5594
Email: gpappas@cov.com

*Attorney for Plaintiff-Appellee*
*Warner Chilcott Company, LLC*